# UNITED STATES DISTRICT COURT
## IN AND FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>EARLAVONNE DEWAYNE BUCKNER, )<br>)<br>Defendant. ) | CASE NO. 3:11-CR-00035-JEG-TJS<br><br>**REPORT AND RECOMMENDATION** |

Pursuant to 28 U.S.C. § 636(b)(1)(B), this United States magistrate judge was directed by United States District Judge James E. Gritzner to conduct an evidentiary hearing for the purposes of preparing a Report and Recommendation regarding disposition of defendant's Motion to Suppress (Clerk's No. 20), filed August 5, 2011.

In accordance with Judge Gritzner's order, a hearing on that Motion to Suppress was held on August 31, 2011, at the United States Courthouse, Davenport, Iowa. The government appeared by Assistant United States Attorney Donald B. Allegro. Defendant Earlavonne Dewayne Buckner (Buckner) appeared in person, and with his lawyer John O. Moeller.

Prior to the hearing, the government filed its response to defendant's Motion to Suppress (Clerk's No. 24) on August 12, 2011. On August 22, 2011 (Clerk's No. 26), the government filed its Supplemental Response to Defendant's Motion to Suppress.

Subsequent to the hearing, and in accordance with his request to the Court, Buckner filed his Supplemental Memorandum in Support of his Motion to Suppress on September 12, 2011 (Clerk's No. 32). The government was permitted to and including September 19, 2011 to file a response to Buckner's supplemental memorandum, and advised the Court that it would not be filing any further pleadings or briefing in this matter.

## FACTS OF THE CASE

Buckner is the sole defendant in an indictment filed April 20, 2011 (Clerk's No. 1), which alleges that on or about March 3, 2011, he was a felon in possession of a firearm and ammunition because prior to that date he had been convicted of a crime punishable by imprisonment for a term exceeding one year. Buckner pled not guilty to that indictment on April 25, 2011, and a jury trial was scheduled for July 5, 2011. At a pretrial conference on June 13, 2011, trial was rescheduled, upon defendant's motion, until September 6, 2011. Thereafter, the trial was continued several times, and is now scheduled to begin on November 7, 2011, at the United States Courthouse, Davenport, Iowa.

In the context of this indictment and trial setting, Buckner is moving to suppress the use as evidence at trial, or any related proceedings, "all items obtained in a search of the Apartment 310, 1131 East 39th Street, Davenport, the person of the Defendant and statements made by Mr. Buckner during and after the entry and search."

Buckner alleges in his Motion to Suppress that Davenport police officers entered the apartment "without a warrant, without exigent circumstances and without voluntary and lawful consent of the occupants," after they had pounded on the door of the residence for several minutes demanding entrance with a show of force, color of authority and demand coupled with a threat to have the land- lord open the door.

Buckner contends that while he is not a resident of the apartment in which the search, seizure and interrogation occurred, nonetheless he has a standing to file this motion because "the mother of his child and his child live in the apartment," and he is there frequently, and maintains personal property at the premises. He argues that the search, seizure and interrogation violated his

rights pursuant to a Fourth Amendment of the United States Constitution, as well as the Constitution of the State of Iowa.

## TESTIMONY AT THE HEARING

Buckner was the only witness in support of his motion. He testified that he has children with Lashauna Morning (Morning), but the two of them do not live together, and he is not a signatory to the lease at Apartment 310, ll31 East 39th Street, Davenport, Iowa.

On the other hand, Buckner testified he does have a key, "just part of a pass key system." He described the building housing Apartment 310 as having 12 apartments on each floor.

It was Buckner's testimony that Morning gave him the key and the access to the pass card system because he was taking care of their one-month-old child, who resides in that apartment. He testified that he was at the apartment three to four times each week. He also testified that he kept clothes and other personal items in that apartment.

Morning has two other children who were not fathered by Buckner, and they reside in the apartment also.

Buckner testified that he sleeps at the apartment on occasion, and that he considered he and Morning to have a "boyfriend/girlfriend situation."

On the other hand, Buckner does not pay rent for that apartment, although he testified he does provide "financial aid" to Morning.

Buckner testified that he arrived at the apartment at approximately 8:00 p.m. on March 3, 2011 expecting to spend the night.

On cross examination, Buckner testified that he is employed seven days a week helping with the care for his mother at her home. He testified that he spends the day with his mother, from 8:00 a.m. until 5:00 p.m., because at that time he feels that she can care for herself.

The government called two witnesses. The first witness was Chris Mahieu, a Davenport police officer with four years' experience in the department.

On March 4, 2011, Mahieu was partnered with Officer Seth Farley. During the evening, as events progressed involving Buckner, Officer Elizabeth Tharp was also present.

Mahieu testified that at approximately 11:00 p.m. on March 3, 2011, he went to the apartment building because officers had been notified of a loud noise problem. Mahieu later recalled that in actuality he arrived at the apartment building after midnight.

It was his testimony that the building in question had 25 apartments on each level, and that each level was divided by fire doors. As he approached Apartment 310 he smelled a strong odor of burning marijuana. Tharp knocked on the door to that unit, advised the occupants they were police officers, and got no response. Mahieu recalled that the officers smelled each door in the area, and the strongest odor was at the door to Apartment 310.

After knocking on the door of that unit, the officers advised the occupants that they needed to come to the door, and that the officers were not going to go away. Mahieu testified he could hear a male and female talking inside, and after knocking the officers heard voices and movement in that unit. It was his opinion that the movements could be destruction of evidence, and he wanted to investigate the marijuana smell.

Mahieu further testified that he felt the officers were justified in entering that apartment because of the smell of burning marijuana, and the movements inside, along with voices.

He said it was his concern that there were drugs located in the apartment, and they were being destroyed.

Mahieu estimated that it was between three and four minutes before Morning opened the door at an approximately 75 degree angle, and stepped aside. He recalled no other persons were visible to the officers at that time with the door open. However, he also added that with the door open the smell of the burning marijuana was overpowering, and he knew the officers were at the right apartment.

Mahieu entered the apartment first, followed by Farley. At that time Farley went through the apartment to see who else was there. Mahieu testified that Morning made no protest or objection to him entering, but she did ask why Farley was going through the apartment.

Mahieu testified that Farley found Buckner, who was coming out of a hallway in the apartment.

It was Mahieu's recollection that Farley was approximately 10 to 15 feet from the front door of the apartment when he got to the hallway, and that Morning never told Mahieu to stop Farley, or for them to leave the apartment. He testified that he and Farley intended to do a cursory search, and then search for drugs, or to get a search warrant. He testified a marijuana "blunt" was found during the cursory search of the apartment.

Initially the only officers present were Mahieu, Farley and Tharp, who had an intern on patrol with her. Neither Buckner nor Morning were handcuffed at the outset of the entrance into the apartment. Mahieu recalled that Buckner and Morning were the only adults in the apartment, and that all the children were sleeping.

Mahieu had to leave the apartment, and go back to his squad car to retrieve the consent form, which he then brought back to the apartment for Morning to sign. Tharp witnessed her signing the consent form.

Mahieu testified that Farley spoke with Morning, and asked her to sign the consent form for search of the apartment. He recalled that she signed the consent after two requests, and she said that nothing would be found in the apartment. The consent that Morning signed was for a search of the apartment without a warrant.

Mahieu testified that Morning was neither threatened, nor had any guns pulled on her so that she would sign the consent. He reiterated that at no time did Morning ever tell the officers to leave the apartment.

It was after Morning signed the consent form that more officers came to the apartment. Mahieu was part of the search team, and he found a gym bag in a front closet of the apartment which contained both marijuana and a loaded pistol.

Farley, according to Mahieu, had "Mirandized" defendant, and after that had occurred, and after the gym bag had been located, Buckner told officers that both the gun and the marijuana belonged to him.

The consent to search signed by Morning was admitted as Exhibit 1 for the purposes of the hearing on the Motion to Suppress.

Mahieu testified that the consent form signed by Morning was read aloud by him to Morning, and that at no time was she was threatened or made any promises as to herself, her children, or Buckner.

Exhibit 2 was also admitted during the hearing. That exhibit consists of a compact disk of video/audio recordings made by Mahieu through a wireless microphone connected to his squad car. The conversations recorded are difficult to follow because of the interference noted in the CD.

On cross examination, Mahieu stated that he prepared the incident report, and noted at the top of the form that the time was 22:51. He also agreed that Exhibit 2 might be from a recording made on Tharp's recording equipment in her squad car.

Mahieu agreed that Farley swept the apartment without consent. He also stated he told Morning several times that a warrant would be obtained if she did not consent. It was Farley who gave the Miranda warnings to Buckner, and that the Miranda warning was oral, and not in writing.

Mahieu recalled that Buckner admitted that the gun was his after Farley had located it.

Mahieu stated that it is possible for him to mute recordings on his own volition. He recalled he did not activate the microphone immediately when he arrived at the apartment building, and that is the reason why not everything that first occurred had been recorded.

Tharp was called as a witness. She has been with the Davenport Police Department for three years.

She testified that she was back-up for Mahieu and Farley, and she followed them into the building.

It was her recollection that the officers knocked for approximately five minutes at the door of Apartment 310. She left while Mahieu and Farley waited at the door to Unit 310 so she could investigate the original noise complaint in the building at Apartment 312.

Tharp agreed that she smelled burning marijuana in the hallway, and once inside the apartment, Unit 310, the odor was much stronger.

Her recollection was that once the officers entered, Morning sat down, but then jumped up and yelled at Farley. At that time Tharp testified that she and Mahieu were able to calm her down.

Tharp testified that no threats were made against Morning to force her to sign the consent. No guns were pulled.

Tharp believed that there was probable cause for the search warrant because of the strong odor of marijuana, and because the officers saw a marijuana blunt in an ashtray.

Tharp witnessed Morning sign the consent form. She did not see Buckner threatened at any time.

Tharp agreed that she wanted the children out of the apartment for a number of reasons, but heard no threats that the Department of Human Services would take the children.

Tharp observed that when Mahieu unloaded the gun in the apartment, Morning got physically ill, and began crying. She stated that Morning did not do this prior to seeing the gun.

## LEGAL ISSUES

While defendant challenges the search conducted by the Davenport Police Department, arguing this warrantless search violated his Fourth Amendment rights, the government argues at the outset that Buckner has no standing to challenge the search of Morning's apartment. The facts supporting the government's argument are that Buckner was not a tenant of Unit 310; he did not pay the rent there; and he did not live there on a regular basis.

A defendant lacks standing to contest the search of a place with which he has an insufficiently close connection. U.S. v. Marquez, 605 F.3d 604, 609 (8th Cir. 2010), citing United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).

In U.S. v. Bruneau, 594 F.2d 1190, 1193, citing Rakas v. Illinois, 439 U.S. 128, 99 s.Ct. 421, 58 L.Ed.2d 387 (1978), the Court of Appeals, noted the standing of a person to challenge a search and seizure based on a substantive Fourth Amendment analysis of the search itself, is subject to a crucial question that was posed in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."

Likewise, the Eighth Circuit in U.S. v. Green, 275 F.3d 694, 698-699 (8th Cir. 2001), and also citing Rakas v. Illinois, 439 U.S. 128, and United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999), held that a person can only assert a violation of his Fourth Amendment rights if he can demonstrate a legitimate expectation of privacy. The court in Green, supra, held that to establish a legitimate expectation of privacy, the defendant must demonstrate: (1) a subjective expectation of privacy; and (2) that this expectation is one that society is prepared to recognize as objectively reasonable. Citing United States v. Muhammad, 58 F.3d 353, 355 (8th Cir. 1995). The ownership, possession and/or control of the area searched or item seized is relevant to the analysis. U.S. v. Gomez, 16 F.3d at 256.

Based on the evidence that the Court has heard, and most notably the absence of any testimony from the tenant of the apartment, Lashauna Morning, the Court does not find that Buckner has standing to challenge this search and seizure.

By his own admission, he is neither a tenant of the building, nor a lessee of this apartment. He does not pay rent, but he apparently provides monetary benefits to Morning because of the child they share.

There is no evidence before this magistrate judge that Buckner in any way established a legitimate expectation of privacy.

He spends an occasional night in the apartment, and apparently is not there even on a daily basis despite the fact that the one-month-old child that he and Morning share resides there.

Buckner could only describe the relationship between Morning and himself as "boyfriend/girlfriend." There was nothing in his testimony that leads the Court to believe that the relationship is based upon the mutual need of parenting skills by this infant. At best, it appears to be a casual relationship connected almost entirely upon the fact that Morning and Buckner share a child.

The nexus here between Buckner's occasional visits to the apartment, and his now claimed expectation of privacy, are too tenuous for the Court to accept.

Regardless of the standing issue, the Court also believes that there were exigent circumstances that existed at the time that this search was conducted by Officers Mahieu, Farley and Tharp.

The Court of Appeals reviews *de novo* the district court's conclusions of law regarding a denial of a motion to suppress evidence. U.S. v. Richards, 611 F.3d 966, 968-69 (8th Cir. 2010), citing U.S. v. Marquez, 605 F.3d 604, 609 (8th Cir. 2010). The Court of Appeals reviews for clear error the district court's findings of fact. U.S. v. Marquez, 605 F.3d at 609.

The Eighth Circuit stated U.S. v. Richards, 611 F.3d at 968-969, that

> Under the Fourth Amendment, the people's right "to be secure in their persons, houses, papers and effects, against unreasonable

searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Although this applies broadly, "[n]ot all personal encounters between law enforcement and citizens fall within the ambit of the Fourth Amendment." United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001). "A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment." Id. A consensual encounter, however, may lose its consensual nature and thus become an unlawful seizure. United States v. Lopez-Mendoza, 601 F.3d 861, 865 (8th Cir. 2010).

In U.S. v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008), the Court of Appeals held

> First, it does not violate the Fourth Amendment merely to knock on a door without probable cause. United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006) ("As commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment even absent reasonable suspicion.", *cert. denied*, 549 U.S. 1151, 127 S.Ct. 1027, 166 L.Ed.2d 773 (2007); see United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006) (police did not violate the Fourth Amendment when they entered defendant's curtilage for legitimate purpose of seeking voluntary conversation and consent to search).... While a police attempt to "knock and talk" can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up, United States v. Poe, 462 F.3d 997, 1000 (8th Cir. 2006); United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997), in this case there are no facts that would show that Blue Bird had reason to feel she had to open up. The encounter happened in the mid-day, Terviel did not command her to open the door, nor was there any suggestion that his knocking was unusually persistent....

In a very recent case, the United States Supreme Court in Kentucky v. King, _____ U.S. _____, 131 S.Ct. 1849, 1856-57 (2011), held

> Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, this Court has inferred that a warrant must generally be secured. "It is a 'basic principle of Fourth Amendment law,'" we have often said, "'that searches and seizures inside a home without a warrant are presumptively unreasonable.'" Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164

-11-

L.Ed.2d 650 (2006) (quoting Groh v. Ramirez, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004)). But we have also recognized that this presumption may be overcome in some circumstances because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Brigham City, supra, at 403, 126 S.Ct. 1943; see also, Michigan v. Fisher, 558 U.S. \_\_\_\_\_, \_\_\_\_\_, 130 S.Ct. 546, 548, 175 L.Ed.2d 410 (2009) (*per curiam*). Accordingly, the warrant requirement is subject to certain reasonable exceptions. Brigham City, supra, at 403, 126 S.Ct. 1943.

One well-recognized exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); see also Payton, supra, 590, 100 S.Ct. 1371 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant").

While the facts of Buckner's case may differ slightly from those in U.S. v. Spotted Elk, again the Court is left without testimony from Morning. The officers stated that they knocked on the door approximately four minutes; defendant suggests that it was for a much briefer time. On the other hand, there is no testimony that Morning was compelled to open the door by any threat, since the testimony from Officer Mahieu clearly indicated that the officers would remain there and obtain a search warrant if they needed to if it took three or four hours.

The fact that all the officers testified that the smell of burning marijuana was most strong outside the door of Morning's apartment, and based upon the officers' testimony that they heard a male and female voice inside the apartment, after first knocking, and that they heard things being moved around, satisfies this magistrate judge that the knock on the door, and the requested entry without warrant, were appropriate, and not in violation of the Fourth Amendment.

A review of the consent signed by Morning, and again in the absence of her testimony, establishes that there was voluntary consent to search the apartment, which ultimately revealed controlled substances and a firearm.

For these reasons, Defendant Earlavonne Dewayne Buckner's Motion to Suppress shall be and is denied.

The parties have to and including October 7, 2011, to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Wade for Robinson v. Callahan, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Such extensions will be freely granted. Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. See, Fed. R. Civ. P. 72; Thompson, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. Thomas v. Arn, 474 U.S. 140, 155 (1985); Griffini v. Mitchell, 31 F.3d 690, 692 (8th Cir. 1994); Halpin v. Shalala, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); Thompson, 897 F.2d at 357.

                                            Respectfully submitted,

Dated: September 27, 2011

_____
THOMAS J. SHIELDS
CHIEF U.S. MAGISTRATE JUDGE